137 P.3d 990

**Leona KALIMA, Dianne Boner, and Raynette Nalani Ah Chong, Special Administrator of the Estate of Joseph Ching, Deceased, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

**v.**

**STATE of Hawai'i;  State of Hawai'i Department of Hawaiian Home Lands;  State of Hawai'i Hawaiian Home Lands Trust Individual Claims Review Panel;  Linda Lingle, in her official capacity as Governor of the State of Hawai'i, Defendants–Appellants,**

**and**

**John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Partnerships 1–10, and Doe Governmental Entities 1–10, Defendants.**

No. 24784.

Supreme Court of Hawai'i.

June 30, 2006.

Charleen M. Aina (Girard D. Lau, with her on the briefs), Deputy Attorneys General, for defendants-appellants.

Carl M. Varady (Thomas R. Grande and Stanley E. Levin, with him on the briefs), Honolulu, for plaintiffs-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and Circuit Judge SAKAMOTO, in place of ACOBA, J., Recused.

Opinion of the Court by MOON, C.J.

The instant interlocutory appeal centers around threshold issues in a class action involving 2,721 claimants, brought by three representatives on behalf of all those similarly situated [hereinafter, the plaintiffs],[1] who are beneficiaries of the Hawaiian home lands trust [hereinafter, the trust or the Hawaiian home lands trust] under the "Hawaiian Homes Commission Act, 1920" (the HHCA), adopted in the Hawai'i State Constitution, article XII, section 1 (1993).[2] The plaintiffs brought the instant suit against defendants-appellants the State of Hawai'i (the State), the State of Hawai'i Department of Hawaiian Home Lands (DHHL), the State of Hawai'i Hawaiian Home Lands Trust Individual Claims Review Panel (the Panel), and Linda Lingle,[3] in her official capacity as Governor, State of Hawai'i [hereinafter, collectively, the State defendants]. The complaint alleged breaches of the HHCA's trust obligations from the time the trust became the responsibility of the State, on August 21, 1959, until the State's first attempt to address the mismanagement of the trust on June 30, 1988. The plaintiffs contended that breaches of the Hawaiian home lands trust caused damage to individuals, as opposed to the trust as a whole, including: (1) mismanagement of the extensive waiting list; (2) mishandling of the plaintiffs' applications; (3) preference policies regarding eligibility requirements; and (4) the awarding of raw lands lacking infrastructure.

Briefly stated, the State, in 1988, granted the HHCA beneficiaries a prospective right to sue for breaches of the Hawaiian home lands trust arising after July 1, 1988, under Hawai'i Revised Statutes (HRS) chapter 673, entitled "Native Hawaiian Trusts Judicial Relief Act" [hereinafter, Chapter 673 claims]. In 1991, the legislature enacted HRS chapter 674, entitled "Individual Claims Resolution Under the Hawaiian Home Lands Trust," to resolve individual beneficiary claims arising between August 21, 1959 and June 30, 1988 [hereinafter, individual claims or Chapter 674 claims]. Chapter 674 created a two-part process, which included an administrative procedure, to address the claims of individual beneficiaries, such as the plaintiffs, followed by judicial proceedings in cases where the claimants were dissatisfied with the outcome of the administrative process. However, Chapter 674, as amended, also provided that any claims filed after December 31, 1999 were barred.

Although the plaintiffs participated in the Chapter 674–administrative process, none of the them received any administrative remedy for their claim. The plaintiffs eventually filed the subject seven-count complaint in the Circuit Court of the First Circuit on December 29, 1999. At some point early in the proceedings, the plaintiffs and the State defendants—with the approval of the circuit court—agreed to limit the proceedings by addressing only the threshold jurisdictional issue of whether the plaintiffs were entitled to sue under HRS chapter 674 and/or chapter 661 ("Actions By and Against the State") for breach of contract [hereinafter, Count I

---

1. We note at the outset of this opinion that, according to the circuit court's class certification order issued on August 28, 2000, the State defendants retained the right to assert any substantive defenses against any named plaintiff, individual member of the plaintiff class, and/or the class as a whole.

2. Haw. Const. art. XII, § 1 provides in pertinent part:

[T]he Hawaiian Homes Commission Act, 1920, enacted by the Congress, as the same has been or may be amended prior to the admission of the State, is hereby adopted as a law of the State, subject to amendment or repeal by the legislature[.]

3. The suit originally named then-Governor Benjamin Cayetano as a defendant.

or Count I (right to sue)]. Thus, the plaintiffs moved for partial summary judgment as to Count I only; the State defendants moved for judgment on the pleadings,[4] arguing that the plaintiffs' claims were barred by sovereign immunity. In granting partial summary judgment as to Count I on August 30, 2000, the circuit court, the Honorable Victoria S. Marks presiding, ruled that the plaintiffs were permitted to pursue their claims under Count I in circuit court and denied the State defendants' motion.

On December 21, 2001, the State defendants brought this interlocutory appeal for judicial review of the circuit court's August 30, 2000 findings of fact (FOFs), conclusions of law (COLs), and order granting the plaintiffs' motion for partial summary judgment as to Count I and denying the State's motion for judgment on the pleadings (August 30, 2000 order).[5]

On appeal, the State defendants contend that the circuit court erred in granting the plaintiffs' motion for partial summary judgment because the statutory conditions of the State's waiver of sovereign immunity were not met. Additionally, the State defendants argue that the circuit court should have dismissed the plaintiffs' claims for money damages for breaches of trust or constitutional violations.

For the reasons discussed below, we affirm in part and vacate in part the circuit court's December 14, 2001 judgment.

## I. BACKGROUND

### A. The Hawaiian Home Lands Trust

During the early 1900s, concern about the plight of the Hawaiian people who had been displaced from rural to urban areas began to emerge as a result of the serious disruption in their traditional way of life. Out of concern for the declining numbers of full-blooded Hawaiians and the recognition that all previous systems of land distribution were ineffective, Congress entertained various homesteading proposals designed to rehabilitate the native Hawaiian people. Eventually, Congress enacted the HHCA, creating a land trust from ceded crown and public lands that was intended to rehabilitate the native Hawaiian people by, *inter alia*, making them eligible to receive the benefits of homesteading through leased land and related programs from the trust.[6] The HHCA designated certain public lands on the five major Hawaiian islands as "available lands." HHCA § 203 (1993). However, notwithstanding the efforts of various individuals, including Senator John Wise and Prince Jonah Kuhio Kalaniana'ole, the available-land designation excluded some of the best agricultural lands of the territory, leaving the trust lands under the HHCA poorly suited to achieving the act's intended purposes. Title to the Hawaiian home lands vested in the United States until the Territory of Hawai'i became a state on August 1, 1959, at which time the newly formed State of Hawai'i entered into a compact with the United States to assume the management and disposition of the Hawaiian home lands. Hawai'i Admission Act of March 18, 1959, Pub.L. 86–3, §§ 4 & 5, 73 Stat. 4 (1959) (Hawai'i Admission Act or Admission Act). The HHCA, together with the Hawai'i Admission Act, impose upon the State the duties and obligations of trustee to oversee the operations carried out under the authority of the HHCA.

4. Because the motion presented "matters outside the pleadings," the circuit court treated the State defendants' motion for judgment on the pleadings "as one for summary judgment" as provided for in Hawai'i Rules of Civil Procedure (HRCP) Rule 12(c) (2004), which states:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity

to present all material made pertinent to such a motion by Rule 56.

5. On November 21, 2001, the circuit court certified the August 30, 2000 order as final under HRCP Rule 54(b) (2004), quoted *infra* at note 18, and judgment was entered on December 14, 2001.

6. Each homestead lease was subject to several conditions, including a provision that the lessee must be native Hawaiian, defined by the HHCA as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." HHCA § 201(a)(7) (1993).

Despite the HHCA's admirable goals, controversy plagued the trust from its inception in 1921 and continued after its transfer to the State in 1959. The problems were of such magnitude that, in 1983, a Federal–State Task Force on the HHCA was convened. The Task Force submitted a report to the State that identified several areas of concern and made recommendations for improvement. The areas included, *inter alia:* (1) problems with the HHCA program itself that affected the trust as a whole, involving (a) the lack of an inventory of the Hawaiian home lands, (b) the lack of useable lands, (c) the lack of proper funding sources, and (d) the improper use/sale/exchange of Hawaiian home lands by state and federal governments; and (2) administrative problems affecting individual beneficiaries, such as (a) delays related to the application and eligibility determination processes and (b) delays resulting from mismanagement of the long waiting lists. Commencing in 1988, the State began its efforts to resolve the issues relating to the trust as discussed below.

B.  *History of the State's Efforts to Provide Redress for Breaches of the Hawaiian Home Lands Trust*

1.  **Act 395 (later codified as HRS Chapter 673)**

In 1988, the Hawai'i State Legislature attempted to address the criticisms of the Ha-

waiian home lands program and provide redress to its beneficiaries through the passage of "The Native Hawaiian Judicial Trusts Relief Act," 1988 Haw. Sess. L. Act 395, §§ 1–7 at 942–945 (Act 395), later codified as HRS chapter 673 (Supp.1988). Act 395 provided a limited waiver of sovereign immunity for beneficiaries of the trust to bring suits, prospectively, for money damages relating to breaches of the State's trust responsibilities occurring after July 1, 1988. 1988 Haw. Sess. L. Act 395, § 3 at 945. In addition, section 5 of Act 395 provided an unfettered right to sue for actual damages for past breaches of trust (*i.e.,* between August 21, 1959 and June 30, 1988) [hereinafter, retroactive claims] and directed that all suits must be brought prior to June 30, 1993. 1988 Haw. Sess. L. Act 395, § 5 at 945.[7] However, the act also provided an opportunity for the governor to present a proposal for resolution of such claims to accommodate the attorney general's concern about the impact of such claims on the State treasury. In the event that the governor failed to present such a proposal to the 1991 Legislature or the proposal was rejected, the right-to-sue provision would remain.[8] 1988 Haw. Sess. L. Act 395, § 5 at 945.

2.  **The Governor's Action Plan**

In 1991, then-Governor John Waihe'e submitted to the legislature "An Action Plan to

---

7.  Section 5 of Act 395 provided in its entirety:

> The governor shall present a proposal to the legislature to resolve controversies which arose between August 21, 1959 and the date of this Act, relating to the Hawaiian home lands trust under Article XII, sections 1,2, and 3 of the Constitution of the State of Hawaii implementing sections 4 and 5(f) of the Admission Act (Act of March 18, 1959, Public Law 86-3, 73 Stat. 4), and the native Hawaiian public trust under Article XII, sections 4, 5, and 6 of the Constitution of the State of Hawaii implementing section 5(f) of the Admission Act.
> If, (1) both of the following occur:
> (a) The governor fails to present a proposal to the legislature prior to the convening of the 1991 legislature in regular session; and
> (b) No other means of resolving such controversies is otherwise provided by law by July 1, 1991, or
> (2) All three of the following occur:
> (a) The governor presents a proposal;
> (b) A resolution calling for the rejection of the governor's proposal is adopted by two-thirds

vote of the house introducing such resolution; and
> (c) No other means of resolving such controversies is otherwise provided by law, by July 1, 1991,
> then in the event of the occurrence of either (1)(a) and (b) or (2)(a), (b) and (c), notwithstanding sections 3 and 4 of this Act, a claim for actual damages under this Act which accrued between August 21, 1959, and the date of this Act may be instituted no later than June 30, 1993, provided that the filing of a claim for actual damages in an administrative proceeding before June 30, 1993, shall toll the statute of limitations until ninety days after the date the decision is rendered in the administrative proceeding.
> 1988 Haw. Sess. L. Act 395, § 5 at 945.

8.  It should be noted that, in light of the opportunity afforded to the governor to submit a proposal to resolve the retroactive controversies, section 5 of Act 395 was *not* included in the codification of Chapter 673.

Address Controversies Under the Hawaiian Home Lands Trust and the Public Land Trust" [hereinafter, Governor's Action Plan or Action Plan], which proposed the creation of a Board of Individual Claims Resolution to hear claims of losses suffered by individual beneficiaries of the trust as a result of the State's breaches of fiduciary duties occurring prior to 1988. The legislature declared that the Governor's Action Plan "me[t] the intent of Section 5 of Act 395," Sen. Con. Res. No. 185, S.D. 1, H.D. 1, and accepted the Action Plan with modifications. Thereafter, the individual beneficiaries' right-to-sue provision became a source of debate in the legislature.

The House Committee on Water, Land Use and Hawaiian Affairs submitted proposed amendments to chapter 673 in House Bill No. 895 (H.B. No. 895), which replaced entirely the previous right-to-sue provision with a completely administrative process to handle the individual claims. Hse. Stand. Comm. Rep. No. 202, in 1991 House Journal, at 911. The administrative process was intended to address the legislature's belief that "the traditional court process [was] a slow, costly, time-consuming investment on the part of the individual beneficiary" and that, "[f]rom the small number of suits versus the large number of controversies, it appear[ed] that the judicial process ha[d] not been accessible to native Hawaiians." Hse. Stand. Comm. Rep. No. 202, in 1991 House Journal, at 911. The House Committee proposed several amendments to the bill, including, *inter alia*, the addition of an appeal process by "changing 'Orders and decisions of the board shall be final and not subject to judicial review' to '(b) Orders and decisions of the board may be appealed through the procedures in section 91–14.' " Hse. Stand. Comm. Rep. No. 202, in 1991 House Journal, at 912.

When H.B. No. 895 reached the Senate, it raised concerns about having an administrative entity adjudicating individual claims. The Senate Committees on Housing and Hawaiian Programs and Judiciary (Senate Committees) noted that "the type of potential suits and the amount of potential damages could not be adequately described or predicted by testifiers." Sen. Stand. Comm. Rep.

No. 969, in 1991 Senate Journal, at 1094. The Senate Committees warned that such uncertainty "could lead the State into a vast, uncharted area of law, and . . . that authorizing the board to make these decisions would be inappropriate." Sen. Stand. Comm. Rep. No. 969, in 1991 Senate Journal, at 1094. The Senate Committees further noted that "[t]he courts are better equipped to settle disputes of this kind and to set standards which are uniform and consistent throughout the State." Sen. Stand. Comm. Rep. No. 969, in 1991 Senate Journal, at 1094. The Senate Committees, therefore, jointly proposed an amendment to the bill "to grant individuals affected by the Hawaiian home lands trust to settle their individually affected controversies . . . by suing directly in circuit court." Sen. Stand. Comm. Rep. No. 969, in 1991 Senate Journal, at 1094.

Eventually, the House and Senate agreed on a compromise, which was described as having the following steps:

(1) First, the establishment of a [the Panel] to receive, review, and evaluate the merits of an individual beneficiary's claim, and to submit a summary of the findings and an advisory opinion regarding the merits of each claim filed with the Panel, including an estimate of the probable award of actual damages or recommended corrective action to the 1993 and 1994 Legislatures.

In order to enable the Panel to reach an advisory opinion regarding the [merits] of each claim filed with the Panel, hearings officers may be authorized to undertake a rendering of the findings on which the advisory opinions will be based. The potential volume of claims may require the use of this procedure to ensure that all claims are considered within the time allowed.

(2) Second, legislative consideration of the reports submitted by the Panel;

(3) Third, disbursement by the Panel of any compensation awarded or implementation or corrective action provided by law; or

(4) Fourth, if an action taken by the 1993 or 1994 Legislature is not accepted by an individual beneficiary claimant, then

the claimant shall have the right to bring an action to recover actual damages for breach of trust in the circuit courts of the State of Hawai'i.

Hse. Conf. Comm. Rep. No. 64, in 1991 House Journal, at 801.

### 3. Act 323 (later codified as HRS Chapter 674)

The 1991 Legislature passed Act 323, 1991 Haw. Sess. L. Act 323, § 1 at 990 (Act 323), entitled "Individual Claims Resolution Under the Hawaiian Home Lands Trust Act," which incorporated the compromised amendments to H.B. 895. Although H.B. 895 had proposed amendments to HRS chapter 673, Act 323 was later codified as HRS chapter 674 (Supp.1991). Chapter 674 establishes the Panel and a claims review process

under which individual beneficiaries under the Hawaiian home lands trust may resolve claims for actual damages arising out of or resulting from a breach of trust, which occurred between August 21, 1959, and June 30, 1988, and was caused by an act or omission of an employee of the State in the management and disposition of trust resources[.]

HRS § 674–1 (1993).

Chapter 674 authorizes the Panel to review and evaluate the merits of claims brought by individual beneficiaries, render findings, and recommend monetary damages and other relief. HRS § 674–1. After reviewing an individual's claims, the Panel is then required to render an advisory opinion to the legislature regarding the merits of each claim, including an "estimate of the probable compensation or any recommended corrective action for legislative action[.]" HRS § 674–1(c).

Chapter 674 set the following deadlines:

(1) submission of claims to the Panel under HRS § 674–7 by August 31, 1993; (2) filing a written notice with the Panel that the claimant does not accept legislative action on his or her claim under HRS § 674–17(b) by October 1, 1994; and (3) filing an action in circuit court under HRS § 674–19 by September 30, 1996.

Chapter 674 also directed the Panel to submit a final report to the 1994 Legislature, including: (1) a summary of each claim brought; (2) the Panel's findings and advisory opinion regarding the merits of each claim; and (3) an estimate of the probable compensation or recommended corrective action. HRS § 674–14 (1993).

### 4. Act 351 (extending Act 323/Chapter 674's filing deadlines)

Because of delays in creating the Panel, the 1993 Legislature extended the Act 323–filing deadlines in chapter 674 as follows: (1) an additional two years for filing claims with the Panel (i.e., by August 31, 1995), HRS § 674–7; (2) an additional three years to file written notice with the Panel that the claimant does not accept legislative action (i.e., by October 1, 1997), HRS § 674–17(b); and (3) an additional three years for filing an action in circuit court (i.e., by September 30, 1999), HRS § 674–19. 1993 Haw. Sess. L. Act 351, § 1 at 991 (Act 351); The deadline for the Panel's final report to the legislature was extended from 1994 to 1997. 1993 Haw. Sess. L. Act 351, § 9 at 994. In 1994, the legislature considered and approved the Panel's recommendation to dismiss the claims of two individual beneficiaries. 1994 Haw. Sess. L. Act 129, § 1 at 298 (Act 129).

### 5. Act 14 (creating trust fund to settle title-related trust issues and shortening time to file suit on Chapter 674–individual claims)

Due to uncertainties regarding land titles arising out of claims related to trust lands and breaches of the trust that affected the trust as a whole, Act 14, which was based on the Governor's Action Plan and Section 5 of Act 395, was promulgated by the 1995 Legislature. 1995 Haw. Sp. Sess. L. Act 14, § 1 at 696. Act 14 expressly stated its intent to settle all retroactive claims, but left intact the Chapter 674 claims. Act 14, *inter alia*, created a trust fund to settle all title-related trust claims arising from the State's misuse of trust lands and precluded all retroactive claims, including those governed by HRS chapter 674, from creating clouds on existing land titles. Act 14 stated that its effect was *res judicata* as to all retroactive claims, except for those claims related to federal gov-

ernment reparations, as well as Chapter 673 and Chapter 674 claims. 1995 Haw. Sp. Sess. L. Act 14, § 4 at 699. Act 14 also shortened the time to file suit in court under HRS chapter 674 by one year to September 30, 1998 to ensure the resolution of the individual claims in a "fair, complete, and timely manner." 1995 Haw. Sp. Sess. L. Act 14, § 2 at 698; *see also* 1995 Haw. Sp. Sess. L. Act 14, § 15 at 702. Thus, the remedies under Act 14 and chapter 674 are complementary: Act 14 seeks to cure fiduciary breaches affecting the trust as a whole, whereas chapter 674 is preserved as the remedy by which individual beneficiaries can pursue claims against the State defendants for personal losses or harm suffered through breaches of the State's fiduciary obligations between 1959 and 1988.

## 6. The Panel's 1997 Report

In early 1997, the Panel prepared and submitted its "Report to the Governor and the 1997 Hawai'i Legislature" (1997 Report). Therein, the Panel reported that it had received 4,327 claims brought by 2,752 claimants prior to the August 31, 1995 filing deadline.[9] The Panel stated that, of the 4,327 claims filed, 396 claims were closed and 3,931 had been accepted for investigation. Further, of the 3,931 claims being investigated, 601 claims were concluded and in various stages of disposition, *i.e.*, recommended award, dismissal, pending hearing, or on remand to the hearings officer. By the end of 1996, the Panel had issued final decisions in "172 claims, affecting 147 claimants," finding "165 [of those] claims meritorious."[10] The 1997 Report also recommended damage awards for 162 claims, totaling approximately $6.7 million. However, the Panel requested a two-year extension to investigate and hear claims in order to complete the distribution of any damage awards by December 1999 because of the large number of claims and the Panel's limited staff and resources.

The Panel categorized all of the claims and determined that "waiting list claims," *i.e.*, those claims involving claimants who had been waiting an unreasonable amount of time for a homestead award, comprised forty-two percent of all claims. Twenty-five percent of all of the claims were "waiting list claims with other issues," such as determinations of blood quantum and claimants affected by DHHL's preference policies. In other words, sixty-seven percent of all claims were "waiting list claims."

After the 1997 Report was submitted, the 1997 Legislature found that there was "disagreement between the parties over the formula utilized by the [Panel] to arrive at award amounts" and that "[t]his disagreement, coupled with the legislature's belief that [the] claims should be handled together, rather than in a piecemeal fashion," necessitated the enactment of Act 382, discussed *infra.* 1997 Haw. Sess. L. Act 382, § 1 at 1209. The legislature, therefore, declined to appropriate the requested funding, stating:

> In light of the ambiguities inherent in the claims currently on submission to the Legislature and addressed in this measure, and the advisability of deliberating on all submitted claims in one package, your Committee declines to recommend funding any portion of the $6.8 million requested appropriation at this time. *Your Committee emphasizes that this is not an action by the Legislature triggering a claimant's right to sue ..., but a deferral of such action and referral of submitted claims back to the Panel for reconsideration in light of the clarifications set forth in this measure.*

Hse. Stand. Comm. Rep. No. 603, in 1997 House Journal, at 1349 (emphasis added).

---

9. It is important to keep in mind that the Panel Report speaks generally in terms of number of *claims,* as opposed to number of *claimants,* when reporting the status of claims within the administrative process (*e.g.*, x-number of claims, affecting x-number of claimants, where the number of claims are greater than the number of claimants).

10. Although the 1997 Panel Report states "172" claims, the "Status of Claims" summary table attached to the report (*see* Appendix) indicates that 165 claims were listed as "Decision by Panel—Liability/Damages/Corr. Action" and seventeen claims were listed as "Decision by Panel—No Liability," for a total of 182 claims.

### 7. Act 382 (extending the Panel's existence and some of Act 351/Chapter 674's filing deadlines)

As previously stated, the Panel was established via Act 323 in 1991 and its existence was extended via Act 351 from 1994 to 1997. The 1997 Legislature agreed to again extend the Panel's existence for an additional two years until 1999 through the passage of Act 382. 1997 Haw. Sess. L. Act 382, § 4 at 1210. Act 382 did not modify the deadline to file claims with the Panel (previously revised via Act 351 in 1993); however, it did extend the deadline for claimants to (1) file a written notice with the Panel rejecting legislative action upon their claims from October 1, 1997 to October 1, 1999 and (2) bring an action in circuit court from September 30, 1998 to December 31, 1999. 1997 Haw. Sess. L. Act 382 §§ 6 and 7, at 1210 (amending HRS chapter 674).

In order to resolve the disagreement over the formula used to determine damage awards, Act 382 also created a working group (Working Group) comprised of the Attorney General, the Director of Budget and Finance, the Chair of the Hawaiian Homes Commission, and the Panel Chair to determine "a formula and any criteria necessary to qualify and resolve" claims filed under HRS chapter 674. The Working Group ultimately submitted an interpretation of chapter 674 that proposed to significantly change the Panel's formula for calculating actual damages and thereby effectively eliminated nearly sixty percent of the claims from consideration.

In response to the Working Group's proposed formula, certain claimants brought suit in circuit court in *Apa v. Cayetano*, Civil No. 97–4641–11, alleging that Act 382 was unconstitutional. Specifically, the claimants asserted that the Working Group was biased and its proposed formula, *inter alia*, violated their right to due process of law under the United States Constitution. The first circuit court agreed, finding that the members of the Working Group appeared to be biased as a result of (1) their official positions and (2) the fact that several of them had testified before the legislature against the types of claims they later found to be non-compensable, *i.e.*, the waiting list claims, which, as previously indicated, are those claims involving claimants who had been waiting an unreasonable amount of time for a homestead award. The circuit court ruled that, "[b]ecause Act 382 and the composition of the Working Group create[d] a significant appearance that the fairness of the claims process under HRS chapter 674 has been abrogated," certain provisions of Act 382 were an unconstitutional denial of due process and delegation of legislative power.

The circuit court further noted that:

Act 382 violate[d] Plaintiffs' rights to equal protection. For those similarly situated, i.e. those who filed claims under HRS § 674, the relief accorded to them will be determined by whether or not they were included in the Panel's 1997 report to the Legislature and entitled to nonmonetary remedial relief or excluded from any relief, if their claims were determined to be ineligible under the Working Group's formula and criteria. The court finds that the distinction between the [waiting list claims and non-waiting list claims] is arbitrary and capricious, as there is no rational basis to treat them differently.

The circuit court, thus, enjoined the members of the Working Group from taking any further action in determining the formula for compensation.[11] The portions of Act 382 that were left intact subsequent to the circuit court's ruling included the extensions of: (1) the life of the Panel by two years, mandating a final report to the 1999 Legislature; (2) the deadline for claimant to file a written notice rejecting the legislative action to October 1, 1999; and (3) the time for filing suit in the circuit court until December 31, 1999.

### 8. The 1999 Report

In 1999, the Panel submitted to the legislature its "Report to the Governor and the 1999 Hawai'i Legislature." Therein, the Panel reported that:

Despite losing almost a year of productive time due to Act 382[, which created the Working Group,] and the [W]orking

---

11. The *Apa* case was never appealed.

[G]roup's recommendations, the Panel has made significant progress in reviewing claims. As of December 31, 1998, the Panel and its staff had either closed or issued recommendations on 2,050 claims, representing 47% of the total number of claims filed. The Panel's cumulative recommended damages awards *for all years* totals $16,434,675.75. While the claims process has moved forward, 53% of the claims filed with the Panel still remain to be reviewed. Consequently, the Panel anticipates asking the 1999 Legislature for another extension of time to complete the review of all claims.

(Emphasis in original.) The 1999 Legislature rejected proposals from the Attorney General and other State officials to amend chapter 674 to implement the limitations on awards recommended by the Working Group, *i.e.,* to exclude the waiting list claims. Instead, the Legislature passed House Bill No. 1675 (H.B. 1675), which extended the notice, filing, and Panel report deadlines by one year, to allow additional time for all claims to be reviewed. However, then-Governor Benjamin Cayetano vetoed the bill. Gov. Msg. No. 241, "Statement of Objections to [H.B.] 1675," in 1999 House Journal, at 882. In vetoing H.B. 1675, Governor Cayetano essentially concluded that the administrative process was not working and that it would take more than an additional year for the Panel to complete its work, which he deemed "totally unacceptable."

### 9. The Final Report

In late 1999, the Panel submitted a "Final Report to the Governor and the Hawai'i State Legislature." Therein, the Panel reported that, from January through June 1999, it had issued decisions in an additional 70 claims, affecting 53 claimants. The Panel found merit in 69 claims, recommending damages totaling $1,536,146.99, and dismissed 180 additional claims from the claims process. As a result of the additional decisions and dismissals, the Final Report stated that, by the end of June 1999, the Panel and its staff had either closed or made recommendations on 53% of all claims, thereby reducing the number of pending claims from 53% to 47%. The Final Report also stated that, at a meeting on June 22, 1999, the Panel had decided to cease its investigation and review of claims in light of the veto of H.B. 1675. Instead, the Panel concentrated its efforts on notifying claimants of the October 1, 1999 notice-filing deadline. As of October 1, 1999, the Panel had received the required written notices in 2,592 claims. The Panel also received from the Native Hawaiian Legal Corporation a written notice, dated September 30, 1999, on behalf of all claimants who had timely filed claims with the Panel but who had not yet filed notices of rejection of legislative action by the September 30, 1999 deadline. The Panel officially closed its doors on October 29, 1999 even though the Panel members' terms continued until December 31, 1999. Three staff members remained through October to answer claimant-inquiries and close the claimants' files.

### C. Procedural History

### 1. Circuit Court Proceedings

On September 30, 1999, the Native Hawaiian Legal Corporation submitted the statutorily required notice of rejection of legislative action on behalf of, *inter alia,* all 2,721 plaintiffs herein, some of whom had submitted the previously mentioned individual written notices.[12] Thereafter, the plaintiffs filed the instant action in circuit court on December 29, 1999.

12. On the same day, three claimants with claims at various stages of the administrative process, filed suit in federal district court, requesting the federal court to extend or nullify both the notice and filing deadlines and, later, for preliminary injunction. *See Kalima v. Cayetano,* Civil No. CV 99–00671 HG–LEK (D.Haw.). The claimants alleged, *inter alia,* equal protection and due process violations. The claimants also alleged that Act 14 created a binding contract that allowed them to pursue their claims under HRS chapter 674. On September 28, 2000, the district court denied "as moot" the claimants' motion for preliminary injunction, filed on October 7, 1999 in light of the circuit court's August 30, 2000 order, discussed *infra,* granting the plaintiffs' motion for partial summary judgment as to Count I of their complaint. The parties stipulated to a dismissal without prejudice of the federal suit.

All 2,721 plaintiffs filed timely claims with the Panel [13]; however, only 418 plaintiffs' claims were completely adjudicated through the administrative process, that is, the claims of 418 plaintiffs were considered by the Panel and resulted in an advisory opinion that was presented to the legislature. The 418 plaintiffs in this category, represented by plaintiff Raynette Nalani Ah Chong, Special Administrator of the Estate of Joseph Ching [14] [hereinafter, the Ah Chong Group], were not awarded any monetary or other relief by the legislature.

Of the remaining 2,303 plaintiffs, fifty-three of them had their claims considered by the Panel and resulted in an advisory opinion. However, opinions set forth therein were not presented to the legislature. The fifty-three plaintiffs in this category are represented by plaintiff Dianne Boner [hereinafter, the Boner Group].

The remaining 2,250 plaintiffs timely filed their claims with the Panel; however, the Panel did not render an advisory opinion on their claims and, consequently, no such opinions were presented to the legislature.

These remaining plaintiffs are represented by plaintiff Leona Kalima [hereinafter, the Kalima Group].

In their complaint, the plaintiffs alleged, *inter alia*, that: (1) HRS chapter 674 gave them a right to sue for damages caused by the State defendants' breaches of trust; and (2) HRS chapters 673 and/or 661 also provided an alternative right to sue the State defendants' for their breach of trust obligations for delaying and failing to complete the claims resolution process established under HRS chapter 674. The plaintiffs sought a declaration and/or injunction to permit them to pursue their claims under HRS chapters 674 and/or 661. The plaintiffs further alleged that the denial of the right to sue under chapters 674 and/or 661 also gave rise to claims for violations of the trust and of the Hawai'i Constitution. In sum, the plaintiffs' seven-count complaint asserted the following claims:

Count I: Right to sue under HRS chapter 674 and/or HRS chapter 661;

Count II: The waiting list and other claims are compensable, and, therefore,

---

**13.** As previously indicated, originally, 2,752 claimants filed 4,327 claims. The 2,721 individual plaintiffs represented herein includes all those claimants whose claims were not settled (2,752 total claimants—31 claimants whose claims were settled = 2,721 claimants), however, the claimants do not indicate the total number of *claims* involved. Based on a review of the complaint, the most that can be said is that there are "at least" 2,721 *claims*. The complaint states in relevant part:

61. As of September 30, 1999, the disposition of the 2,752 *claimants* who timely filed claims with the Panel is as follows:

Number of *claimants* who settled their claims 31

Number of *claimants* who timely filed claims with the Panel for whom the Panel did not issue Advisory Opinions recommending relief and whose claims were not submitted to the Legislature by the [P]anel (including Plaintiff Kalima) 2,250

Number of *claimants* who had Advisory Opinions issued by the Panel recommending relief which were not reported to the Legislature for which the Legislature provided no relief (including Plaintiff Boner) 53

Number of *claimants* who had Advisory Opinions issued by the Panel which were reported to the Legislature for which the Legislature provided no relief (including Plaintiff Ching) 418

(Emphases added.) Thereafter, the plaintiffs categorize the *claims* into three "subclasses," consisting of "*at least* 418 *individuals*," "*at least* 53 *individuals*," and "*at least* 2,250 *individuals*," which apparently indicates that some of the plaintiffs may have more than one claim. It is important to keep in mind that the Panel reports, as previously indicated, speak in terms of number of *claims*, whereas the parties appear to speak in terms of number of *claimants* or individuals.

**14.** The Supreme Court record (SCR) indicates that plaintiff Joseph Ching died during the pendency of this appeal on February 24, 2001 and that the plaintiffs moved to substitute Raynette Nalani Ah Chong, Special Administrator of the Estate of Joseph Ching, as his representative. The record also indicates that, as of April 22, 2002, eight plaintiffs, including Joseph Ching, were deceased. The other seven deceased claimants are: Joseph Damian Delaginte, Sr., Lucille Oiliokalani Waikiki, William Ekau Lanai, Ellen Kapaki Kalikikane, Louise Frida Mahelona, Ethel Makahala Christensen, and Robert Kamakauliuli Kanahele, Sr.

they are entitled to a determination of the nature and elements of compensation under HRS chapter 674, HRS chapter 673 and/or HRS chapter 661;

Count III: Breach of trust;

Count IV: Breach of fiduciary duty;

Count V: Violation of their due process rights under article I, § 5 of the state constitution;

Count VI: Violation of their equal protection rights under article I, § 5; and

Count VII: Violation of their traditional and customary rights under article XII, § 7.

With the circuit court's approval, the parties agreed to structure the circuit court proceedings such that the issue of the court's jurisdiction was addressed first. The parties also agreed that any claim premised on HRS chapter 673 would be addressed only if the circuit court concluded that the plaintiffs' HRS chapter 674 claims were not available or actionable.

On May 16, 2001, the plaintiffs filed a motion for partial summary judgment as to Count I (right to sue) for breaches of the trust under HRS chapter 674 and/or breach of settlement agreement under HRS chapter 661.[15] The State defendants moved for judgment on the pleadings, asserting principally that the complaint should be dismissed because sovereign immunity barred all of the plaintiffs' claims. The State defendants further contended that, although HRS chapter 674 waived the State's immunity for monetary damages, the waiver was limited and had expired or lapsed before the conditions or prerequisites of the waiver were satisfied.[16]

On August 30, 2000, after a hearing, the circuit court found in favor of the plaintiffs and entered the following relevant conclusions of law:

7. This Court has subject matter jurisdiction pursuant to HRS § 603–21.5 (general jurisdiction), HRS §§ 603–21.5 and 632–1 (declaratory relief), HRS § 674–17 (breach of trust claims arising between 1959 and 1988) and HRS § 661–1 et seq. (breach of settlement agreement and contract).

8. This Court has personal jurisdiction over [the State defendants] pursuant to [HRS] § 674–16 and [HRS] § 661–1.

9. Plaintiffs are entitled to judgment as a matter of law as set forth below.

10. Plaintiffs are entitled to a declaration of their rights as they have presented an actual controversy and enjoy relations, status and rights and privilege under HRS [c]hapter 674 and HRS [c]hapter 661 giving them concrete interests for which declaratory relief is proper.

11. Chapter 674 is a remedial statute that must be liberally construed to accomplish the purpose for which it was enacted. *Taylor v. Gov[']t] Employees Ins. Co.,* 90 [Hawai'i] 302, 308, 978 P.2d 740, 746 (1999); *Flores v. United Air Lines,* 70 Haw. 1, 12 n. 8, 757 P.2d 641 (1998[1988]).

12. Chapter 674 was intended to provide plaintiffs, as HHCA beneficiaries, the right to have their claims decided in [c]ircuit [c]ourt.

13. Under HRS § 674–16, the State of Hawai'i has waived its sovereign immunity for breaches of its duties under the HHCA.

---

15. As discussed more fully *infra, see* section III. C., the plaintiffs contend that Act 14 (creating a trust fund) is a settlement agreement that resolves all retroactive claims by (1) providing land and/or money to compensate the trust for breaches affecting the trust as a whole and (2) guaranteeing the remedies provided to individual beneficiaries under HRS chapter 674. Therefore, the plaintiffs believe that the State defendants breached that agreement by failing to provide any remedy to the claimants and by opposing the instant suit.

16. As previously mentioned, the circuit court also issued an order granting the plaintiffs' mo-

tion to certify a class for purposes of Count I only. On October 23, 2000, the circuit court granted in part the plaintiffs' Motion for Summary Judgment and Declaratory Relief on Count II of Their Complaint, stating that "[a]ll claims for breach of trust or breach of fiduciary duty can be brought and litigated by Plaintiffs under [HRS chapter 674]." In the same order, the circuit court denied the State defendants' Motion for Summary Judgment Affirming That "Waiting List Claims" Are Not Recoverable without prejudice. These orders are not currently before this court.

14. Plaintiffs have completed all prerequisites to bringing suit against the State [defendants] pursuant to HRS [c]hapter 674.

. . . .

17. The Legislature's failure to award Plaintiffs compensation or other relief contemplated under Chapter 674 was "action taken by the legislature in regular session" within the meaning of HRS § 674–17(b).

. . . .

19. Plaintiffs have exhausted their administrative remedies in accordance with HRS § 674–17.

20. Plaintiffs commenced a timely action in circuit court.

. . . .

21. Plaintiffs are "aggrieved individual claimants" within the meaning of § 674–17(b).

22. Plaintiffs are properly before this court in the present action and are entitled to pursue their claims for money damages and other relief contemplated by HRS §§ 674–17(a) and 674–19 for breaches of the HHCA trust obligations by DHHL occurring between August 21, 1959 and June 30, 1988.

23. Plaintiffs' claims are actionable under HRS [c]hapter 661–1.

24. The remedies available under Chapter 674 were expressly incorporated into Act 14.

25. Act 14 was a settlement agreement and, therefore a contract, settling general claims for misuse and misappropriation of Trust lands in consideration of the promise to pay a total of $600 million and preservation of the individual right to seek redress and to sue under Chapter 674.

26. Act 14 was intended as a contract of settlement for beneficiaries' breach of trust claims related to HHCA.

27. The remedies provided under Chapter 674 were clearly an essential component of the consideration given by the State of Hawai'i to Plaintiffs and other beneficiaries of the HHCA in exchange for the settlement of all other claims by the HHCA beneficiaries against the State [defendants].

28. Under the terms of Act 14, the State of Hawai'i is contractually obligated to provide all Plaintiffs with the full range of remedies contemplated under Chapter 674.

29. Act 14 imposed contractual obligations on the State in favor of Plaintiffs and other beneficiaries of the HHCA.

30. Act 14 confirms a settlement agreement of disputed rights and defines its terms. *Dodge v. Bd. of Educ[.]*, 302 U.S. 74, 78[, 58 S.Ct. 98, 82 L.Ed. 57] (1937); *New Jersey v. Yard*, 95 U.S. 104[, 24 L.Ed. 352] (1977[1877]); *New Jersey v. Wilson*, 11 U.S. [7 Cranch] 164[, 3 L.Ed. 303] (1812).

. . . .

33. Plaintiffs may sue the State of Hawai'i under HRS § 661–1 for breach of the settlement agreement and contract with Plaintiffs embodied in Act 14.

. . . .

35. As matters outside the pleadings have been referred to and considered by the Court regarding [the State defendants'] Motion for Judgment on the Pleadings, that motion shall properly be considered as a motion for summary judgment.

The August 30, 2000 order was reduced to a separate judgment entered on December 14, 2001.[17] The circuit court entered judgment pursuant to HRCP Rules 54(b)[18] and

17. Initially, the State defendants, with the circuit court's permission, brought an interlocutory appeal pursuant to HRS § 641–1(b) from the August 30, 2000 order. This court dismissed the appeal *sua sponte*, on September 12, 2001, for lack of appellate jurisdiction because the circuit court's ruling on Count I was not reduced to a separate judgment and because the plaintiffs' remaining claims were not finally resolved. The State filed a motion for reconsideration which was denied on October 13, 2001. On October

18, 2001, the State defendants filed a motion to certify the August 30, 2000 order under HRCP Rules 54(b) and 58 (1990). *See infra* notes 18 and 19.

18. HRCP Rule 54(b) provides in pertinent part:

**Judgment upon multiple claims or involving multiple parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, [or] cross-claim ... the court may direct the entry of a final judgment

58,[19] in favor of the plaintiffs and against the State defendants as to all claims and defenses determined by the August 30, 2000 order.

## 2. Appellate Proceedings

The State defendants filed their timely notice of appeal on December 20, 2001, asserting the following points of error:

1. The circuit court erred in rejecting the State [defendant's] sovereign immunity defense to the plaintiffs' claims for general, special and punitive damages, whether

    A. Those claims for damages were expressly asserted as in Counts III and IV of the complaint, or made by simply referring to "relief" as in Counts V, VI, and VII of the complaint, or by implication through specific or general requests for declaratory and injunctive relief to correct past violations of law;

    B. Those claims were brought under [HRS] [chapter] 674 or 661 (Counts I or II) on theories of breach of trust (Count III) or fiduciary duty (Count IV), or simply on assertions that the due process and takings clauses (Count V), the equal protection clause (Count VI), or the native Hawaiian traditional and customary rights provisions of Article XII, [s]ection 7 (Count III) of the State Constitution had been violated.

More specifically, the circuit court erroneously concluded that the plaintiffs were permitted to sue the State [defendants] for damages for breach of trust under [HRS] §§ 674–16 and 674–17, and for breach of contract under [HRS] § 661–1[.]

2. The circuit court erred in concluding that Act 14, [1995 Haw.] Sp. Sess. L[. at] 696, is in part a contract upon which the plaintiffs may sue the State [defendants] for damages under [HRS] 661–1[.]

3. The circuit court erred as a matter of law in rejecting the State defendants' alternative argument that [HRS] § 674–17(b)'s October 1, 1999 deadline is a statute of repose by which any right to sue that

as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment[.]

the State may have conferred expired or lapsed[.]

4. The circuit court erred as a matter of law in construing [HRS] § 674–17 as merely setting forth administrative remedies which ordinarily would have to be exhausted but which under the circumstances here could be waived because the plaintiffs should not be penalized for their ability to control the Panel or the Legislature[.]

On April 22, 2002, the plaintiffs filed a motion for expedited consideration of the State's appeal for the following reasons: (1) the dismissal of the State's initial appeal delayed the proceedings by more than a year; (2) the issues raise a matter of great public interest; (3) the beneficiaries had already waited nearly ten years for their claims to be resolved; (4) several of the class members had already died while waiting for relief; and (5) because the claims were for conduct occurring as early as 1959, there was "a legitimate concern that other beneficiaries [would] not live to see their rights litigated." This court denied the plaintiffs' motion for expedited consideration on May 3, 2002. Thereafter, pursuant to this court's February 23, 2006 order of no oral argument, the plaintiffs filed a motion for retention of oral argument on March 1, 2006 for reasons similar to that stated in their motion for expedited consideration. This court granted the plaintiffs' motion on March 20, 2006, and oral arguments were heard on May 30, 2006.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

█ We review a circuit court's grant of summary judgment *de novo*. *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (citing *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22 (1992)).

(Emphasis in original.)

**19.** HRCP Rule 58 provides in pertinent part that "[e]very judgment shall be set forth on a separate document."

98

### B. *Statutory Interpretation*

■ The interpretation of a statute is a question of law reviewed *de novo*. *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327–28 (1998) (citing *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)).

## III. *DISCUSSION*

### A. *An Overview of the Requirements and Procedures of HRS Chapter 674*

HRS chapter 674[20] is divided into three parts:

(1) "Purpose and Definitions" (Part I), HRS §§ 674–1 and –2;

(2) "Individual Claims Review Panel" (Part II (administrative process)), HRS §§ 674–3 through –15; and

(3) "Judicial Relief for Retroactive Claims by Individual Native Hawaiians" (Part III (judicial process)), HRS §§ 674–16 through –21.

The chapter creates a two-part process whereby claims must first be brought before an administrative panel, and, if the remedy provided is unacceptable to the claimant, the claim may be brought in circuit court.

Part II of Chapter 674 is the codification of the administrative process promulgated by the legislature via Act 323 and provides in pertinent part:

[§ 674–3] **Establishment of the board of individual claims resolution.** There shall be a Hawaiian home lands trust individual claims review panel to be composed of five members[.]

§ 674–4 [(Supp.1999)] **Tenure and compensation of members.** The term of office of each member of the [P]anel shall be until December 31, 1999[.]

. . . .

§ 674–6 **Rulemaking powers.** The [P]anel shall adopt rules in accordance with chapter 91 prescribing the procedures to be followed in the filing of claims and in the proceedings for review of claims[.]

§ 674–7 **Review by panel required.** Any individual beneficiary under the trust claiming actual damages arising out of or resulting from a breach of trust which occurred between August 21, 1959, and June 30, 1988, and which was caused by an act or omission of an employee of the State in the management and disposition of trust resources under the trust, <u>shall file a claim therefor for review by the [P]anel no later than August 31, 1995, or shall forever be barred.</u>

[§ 674–8] **Powers and procedures of the [P]anel.** (a) The [P]anel may hold hearings or such other proceedings as it deems necessary[.]

. . . .

(d) The [P]anel may appoint a hearings officer or officers . . . to hear any claims and render recommended findings.

(e) Upon written acceptance by a claimant . . . the [P]anel shall disburse any compensation awarded by the legislature and undertake such other action as provided by law.

§ 674–9 **Panel hearing or review proceedings; fact-finding; evidence** . . . .

All proceedings shall be informal. . . . For the purpose of this chapter, the [P]anel shall prepare a record of each claim. The record shall include:

. . . .

(7) The [P]anel findings and advisory opinion.

. . . .

§ 674–10 **Findings and advisory opinion.** (a) The [P]anel shall prepare findings and an advisory opinion concerning the probable merits of a claim, probable award of compensation, or recommended corrective action by the State.

. . . .

(c) The advisory opinion of the [P]anel rendered on each claim shall be incorporated in the reports . . . for submission to the legislature.

§ 674–11 **Subsequent litigation; excluded evidence.** No statement made in the course of any investigation, hearing, or review proceedings of the [P]anel shall be admissible in evidence . . . for any . . .

**20.** All references to HRS chapter 674 are to the 1993 version unless otherwise noted.

purpose in any legal proceeding. No opinion, conclusion, finding, or recommendation of the [P]anel on the issue of liability, or on the issue of compensation, or corrective action shall be admitted into evidence in any legal proceeding, nor shall any party to the [P]anel hearing, or the counsel, or other representative of the party, refer to or comment thereon in any opening statement, any argument, or at any other time, to any court or jury.

. . . .

§ 674–14 **Annual report** [(Supp.1999)]. The [P]anel shall prepare a report to be transmitted to the governor and the legislature, at least twenty days prior to the convening of the regular session of 1998, and a final report to be transmitted to the governor and to the legislature, at least twenty days prior to the convening of the regular session of 1999, which summarizes its activities in furtherance of this chapter, and shall include a summary of each claim brought before the [P]anel, the [P]anel's findings and advisory opinion regarding the merits of each claim, and an estimate of the probable compensation or recommended corrective action by the State, for action by the legislature in regular session.

[§ 674–15] **Limitations upon award of compensation or corrective action.** No claim shall be made under this chapter for which a remedy was or is provided elsewhere under the laws of this State, which is or was the subject of pending or prior litigation, or which is predicated, in whole or in part, on an action or omission which occurred prior to August 21, 1959.

. . . .

(Bold emphases and some brackets in original.) (Underscored emphases added.) In sum, the administrative process requires a claimant to file a claim before the Panel by August 31, 1995. The Panel, in turn, must: (1) review the claim; (2) prepare a record that includes findings and an advisory opinion, setting forth a recommended action on each claim; (3) prepare and submit a report to the legislature; and, (4) if accepted by the claimant, disburse any compensation awarded by the legislature or undertake any other lawful action.

Part III of Chapter 674 is the codification of the judicial process promulgated by the legislature via Act 323 and provides in relevant part:

§ 674–16 **Waiver of Immunity.** (a) The State waives its immunity from liability for actual damages suffered by an individual beneficiary arising out of or resulting from a breach of trust or fiduciary duty, which occurred between August 21, 1959, to June 30, 1988, and was caused by an act or omission of an employee of the State in the management and disposition of trust resources.

(b) This waiver shall not apply to the following:

(1) Any claim for which a remedy was or is provided elsewhere in or under the laws of the State;

(2) Any claim which was or is the subject of prior or pending litigation; or

(3) Any claim predicated, in whole or in part, upon any act or omission which occurred prior to August 21, 1959.

§ 674–17 [(1993 & Supp.1999)] **Right to sue, individual claims.** (a) An <u>aggrieved individual claimant</u> shall have the right to bring an action, in accordance with [Part III], in the circuit courts of the State for recovery of actual damages suffered by the claimant arising out of or resulting from a breach of trust which occurred between August 21, 1959, to June 30, 1988; provided that <u>no action shall be filed until after October 1, 1997</u>.

(b) "Aggrieved individual claimant", as used in this section, means <u>an individual claimant [1] whose claim was reviewed by the [P]anel under this chapter and [2] who has filed, no later than October 1, 1999, a written notice with the [P]anel that the claimant does not accept the action taken by the legislature in regular session upon the claim</u>. Any claimant who fails to file a written notice rejecting the action of the legislature upon the claim shall be deemed to have accepted the action taken by the legislature.

[§ 674–18] **Scope of Relief.** In an action under this part the court may award actual damages to a successful claimant.

§ 674–19 [(Supp.1999)] **Limitation on actions.** Every claim cognizable under this part shall forever be barred unless the action is commenced by December 31, 1999.

§ 674–20 **No implied liability or award.** In no case shall any liability be implied against the State, and no award shall be made against the State on any claim brought under this part except upon legal evidence that would establish liability against an individual or corporation.

(Bold emphases and some brackets in original.) (Underscored emphases added.)

The judicial process, however, is not a review of the legislature's action upon the claim or the Panel's proceedings and recommendations; it is, essentially, a *de novo* proceeding. In sum, Part III requires that a claimant: (1) wait until after October 1, 1997 to bring suit in circuit court; (2) file a written notice with the Panel rejecting the action upon the claim by October 1, 1999; and (3) file an action upon the claim in circuit court by December 31, 1999.

■ It is important to note here that the parties disagree as to which principle of construction this court should apply in interpreting HRS chapter 674. First, the plaintiffs contend that the chapter is remedial and should, therefore, be construed liberally. "Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." *Flores v. United Air Lines, Inc.*, 70 Haw. 1, 12 n. 8, 757 P.2d 641, 647 n. 8 (1988) (quoting N. Singer, 3 *Sutherland, Statutes and Statutory Construction* § 60.02 (4th ed.1986)). This court has stated that remedial statutes should be "liberally construed to suppress the perceived evil and advance the enacted remedy" and has disfavored narrow interpretations that "impede rather than advance the remedies" provided by such statutes. *Flores,* 70 Haw. at 12, 757 P.2d at 647 (brackets, citation, and internal quotation marks omitted); *see also, Taylor v. Gov't Employees Ins. Co.*, 90 Hawaiʻi 302, 308, 978 P.2d 740, 746 (1999) (holding that motor vehicle policy coverage statute was remedial in nature and, therefore, entitled to liberal con-

struction). Inasmuch as HRS chapter 674 establishes a "process under which individual beneficiaries under the Hawaiian home lands trust may resolve claims for actual damages," HRS § 674–1, for past breaches of trust, the chapter as a whole provides a remedy for the redress of the individual beneficiaries' injuries and, thus, falls squarely within the definition of a remedial statute. Second, as the State defendants correctly note, the right-to-sue provision in Part III of Chapter 674 is part and parcel of a waiver of sovereign immunity and must be strictly construed. *Taylor-Rice v. State,* 105 Hawaiʻi 104, 110, 94 P.3d 659, 665 (2004).

With the above principles in mind, we now turn to examine the issues and arguments of the parties in the instant case. We first address whether the circuit court properly granted partial summary judgment in favor of the plaintiffs on Count I of their complaint.

B. *Whether the Circuit Court Erred in Granting Partial Summary Judgment to the Plaintiffs in Count I on the Basis that the Plaintiffs are Entitled to Sue for Breaches of Trust Under HRS Chapter 674*

**1. HRS § 674–16's Specific Waiver of Immunity**

As previously stated, HRS § 674–16 provides:

(a) The State waives its immunity from liability for actual damages suffered by an individual beneficiary arising out of or resulting from a breach of trust or fiduciary duty, which occurred between August 21, 1959, to June 30, 1988, and was caused by an act or omission of an employee of the State in the management and disposition of trust resources.

(b) This waiver shall not apply to the following:

(1) Any claim for which a remedy was or is provided elsewhere in or under the laws of the State;

(2) Any claim which was or is the subject of prior or pending litigation; or

(3) Any claim predicated, in whole or in part, upon any act or omission which occurred prior to August 21, 1959.

The parties agree that HRS § 674–16 is a specific waiver of the State's sovereign immunity and a consent to be sued for money damages for breaches of trust occurring between August 21, 1959 and June 30, 1988 and that, in order to bring suit in circuit court, they must have complied with chapter 674's administrative procedural requirements and deadlines. The State argues that sovereign immunity bars the plaintiffs' claims under HRS chapter 674 because the plaintiffs have not demonstrated that they have satisfied "each and every prerequisite" of Chapter 674's waiver or that their claims come within the waiver's contemplated scope.

The plaintiffs disagree, arguing that their claims *are* actionable because:

(1) [they] were given a right to sue under an express waiver of sovereign immunity by the State which is in full force and effect; ... and, [2] these plaintiffs ha[ve] complied with all procedural requirements to the full extent possible, including the timely filing of notice to the Panel and timely filing of the lawsuit.

(Capital letters altered.)

▆▆▆ Generally, "[a] sovereign [s]tate is immune from suit for money damages, except where there has been a 'clear relinquishment' of immunity and the [s]tate has consented to be sued." *Bush v. Watson,* 81 Hawai'i 474, 481, 918 P.2d 1130, 1137 (1996) (quoting *Pele Defense Fund v. Paty,* 73 Haw. 578, 605, 837 P.2d 1247, 1265 (1992)) (internal quotation marks omitted). Thus, as previously stated, a waiver of sovereign immunity must be strictly construed. *Taylor–Rice,* 105 Hawai'i at 110, 94 P.3d at 665.[21] In other words, a statutory waiver of sovereign immunity must be clear and unequivocal and must be strictly construed.

Here, although the parties agree that section 674–16 is a specific waiver of sovereign immunity, they disagree on the conditions of that waiver and whether the plaintiffs have met all of Chapter 674's requirements. As indicated in the overview section, *supra,* the chapter creates two separate avenues for relief, but requires the individual claimants to engage first in the administrative process set forth in Part II of the chapter. Therefore, we next examine whether the plaintiffs have met the conditions of HRS chapter 674's waiver of immunity.

2. **Whether the Plaintiffs Qualify as "[A]ggrieved [I]ndividual [C]laimant[s]" under HRS § 674–17**

As previously indicated, HRS § 674–17 provides:

(a) An *aggrieved individual claimant* shall have the right to bring an action, in accordance with [Part III], in the circuit courts of the State for recovery of actual damages suffered by the claimant arising out of or resulting from a breach of trust which occurred between August 21, 1959, to June 30, 1988; provided that *no action shall be filed until after October 1, 1997.*

(b) "Aggrieved individual claimant", as used in this section, means *an individual claimant [1] whose claim was reviewed by the [P]anel under this chapter and [2] who has filed, no later than October 1, 1999, a written notice with the [P]anel that the claimant does not accept the action taken by the legislature in regular session upon the claim.* Any claimant who fails to file a written notice rejecting the action of the legislature upon the claim shall be deemed to have accepted the action taken by the legislature.

(Emphases added.)

The State defendants argue that the plaintiffs do not qualify as "aggrieved individual claimant[s]," under the plain language of HRS § 674–17 because the claim-making process under that section was never completed. According to the State defendants, HRS chapter 674's waiver of immunity re-

---

**21.** The State defendants refer to this court's decision in *Helela v. State,* 49 Haw. 365, 418 P.2d 482 (1966) for the proposition that plaintiffs must satisfy "each and every prerequisite" of a waiver of sovereign immunity. However, the holding in *Helela* relies on no more than a straightforward application of the applicable statute's plain language, and, as such, the case does not add to the discussion herein.

quires that the following steps be sequentially completed:

(1) the beneficiary had to file a claim with the Panel by August 31, 1995 (or it would "forever be barred"); (2) the Panel had to render an advisory opinion on the claim and send it to the [l]egislature for action; (3) the [l]egislature had to take action on the Panel's opinion; and (4) the beneficiary must [have] file[d] a written notice rejecting the [l]egislature's action, by October 1, 1999.

The State defendants contend that the legislative history suggests an unwillingness to allow the individual claimants to sue for retrospective relief without a study, *i.e.*, completion of the administrative process.

The plaintiffs contend that the statute imposed only the following prerequisites to filing suit in circuit court: (1) timely filing of their claims with the Panel; (2) timely submission of written notices to the Panel that they reject the legislative action on their claims; and (3) timely filing of the instant action in the circuit court.

HRS chapter 674 requires a claimant to: (1) file a claim before the Panel by August 31, 1995, HRS § 674–7; (2) wait until after October 1, 1997 to bring suit in circuit court, HRS § 674–17(a); (3) file a written notice with the Panel rejecting the action upon a claim by October 1, 1999, HRS § 674–17(b); and (4) file an action upon the claim in circuit court by December 31, 1999. HRS § 674–19. In that regard, the circuit court found:

49. The statutory notice to sue, mandated by HRS § 674–17, for the entire class of [p]laintiffs in this action, was submitted to the Panel on September 30, 1999, by the Native Hawaiian Legal Corporation on behalf of the 2,721 claimants who submitted timely claims with the Panel prior to August 31, 1995, and whose claims were not settled by the Panel.

50. The present action was filed on December 29, 1999, as a class action on behalf of 2,721 claimants who filed timely claims with the Panel and whose claims were not settled by the Panel.

The circuit court, thus, concluded that the plaintiffs have met the statutory notice and filing deadlines. The State defendants do not contest at this time that the plaintiffs met the above deadlines.[22] However, as previously noted, the State defendants nevertheless contend that the plaintiffs' claims are untimely because "review by the Panel" and legislative "action" upon each claim are additional conditions precedent to the right to sue that were not completed prior to the statutory deadlines. Accordingly, the State defendants maintain that the plaintiffs are not "aggrieved individual claimant[s]" as defined in the statute and, consequently, are not entitled to bring suit in circuit court.

a. *"review" by the Panel*

The State defendants argue that step two of the process requires that the Panel review each claim and render an advisory opinion on the claim before a claimant can reach the next step, *i.e.*, legislative consideration and action upon the claim.

HRS § 674–1 provides:

**Purpose.** The purpose of this chapter is to establish a process under which individual beneficiaries under the Hawaiian home lands trust may resolve claims for actual damages . . . :

(1) By establishing [the Panel] which shall:

(A) Receive, review, and evaluate the merits of an individual beneficiary's claim;

(B) Render findings and issue an advisory opinion regarding the merits of each claim filed with the [P]anel, including an estimate of the probable award of actual damages or recommended corrective action that may be implemented to resolve each claim;

(C) Prepare and transmit a report to the governor and legislature . . . on the activities of the [P]anel including a summary of each claim brought before the [P]anel . . . ;

---

22. However, as previously noted, the class certification order reserved the State defendants' right to assert any substantive defenses against

any named plaintiff, individual member of the plaintiff class, and/or the class as a whole. *See supra* note 1.

(D) Disburse any compensation awarded by the legislature in regular session or undertake other actions as provided by law which are acceptable to a claimant[.]

(Bold emphasis in original.) (Underscored emphases added.) In addition, HRS § 674-10 specifically requires that:

(a) The [P]anel shall prepare findings and an advisory opinion concerning the probable merits of a claim, probable award of compensation, or recommended corrective action by the State.

(b) The findings and advisory opinion shall be signed by all members of the [P]anel; provided that any member of the [P]anel may file a written concurring or dissenting advisory opinion.

(c) The advisory opinion of the [P]anel rendered on each claim shall be incorporated into the reports by section 674-14 for submission to the legislature.

(Underscored emphases added.) Finally, under HRS § 674-14,

[t]he [P]anel shall prepare a report to be transmitted to the governor and to the legislature, at least twenty days prior to the convening of the regular session of 1998, and a final report to be transmitted to the governor and to the legislature, at least twenty days prior to the convening of the regular session of 1999, which summarizes its activities in furtherance of this chapter, and shall include a summary of each claim brought before the [P]anel, the [P]anel's findings and advisory opinion regarding the merits of each claim, and an estimate of the probable compensation or recommended corrective action by the State, for action by the legislature in regular session.

(Underscored emphases added.) In sum, the Panel must receive and review each claim, as well as submit reports to the legislature that includes a summary of its activities, its findings and opinions regarding the merits of each claim, and its recommendations for an award of damages or corrective action.

An examination of the reports submitted by the Panel to the legislature indicates that the Panel met the statutory requirements of HRS §§ 674-10 and -14. As previously indicated, the Panel submitted the first required report to the 1998 Legislature, summarizing its activities with respect to 4,327 timely filed claims. The report indicated the status of each claim, stating that: (1) 396 claims were closed after preliminary investigation; (2) 3,931 claims were accepted for further investigation (accepted-claims); (3) the investigation of 601 accepted-claims was complete; and (4) final decisions in 182 claims had been issued. The report categorized each accepted-claim and indicated the number of claims in that category, *i.e.*, "Waiting List," "Lost Applications," "Qualifications," etc. In an appendix to the report, the Panel provided a summary of the "Panel's Final Decisions and Orders [on] Meritorious Claims," including a short description of each claim and the Panel's recommendation for an award of damages and/or corrective action. The Panel submitted its second required report to the 1999 legislative session in which it updated the status of each of the 4,327 claims filed before the Panel. The report stated that, by the end of December 1998, it had "either closed or issued recommendations on 2,050 claims, representing 47% of the total number of claims," which meant that 53% of the total number of claims filed with the Panel were pending. The Panel issued a final report in 1999, although not required by HRS § 674-14, in which it again updated the status of each claim and summarized its activities from 1991 through October 1999. By that time, the Panel reported that it had completed its investigation of 1,645 claims and had either closed or made recommendations on 53% of all claims filed, but that it had ceased its activities after the veto of H.B. 1675 (which would have extended the notice and filing deadlines by one year).

■ In reaching its initial determination to close or accept each of the 4,327 timely filed claims, the Panel preliminarily investigated each claim and made an initial determination of its probable merit, closing 396 cases after the preliminary review. The Panel's investigation and categorization of the accepted-claims indicates that the accepted-claims were reviewed a second time. The claims that proceeded beyond the investigation stage were subject to a final review and

determination of its probable merit and award of damages and/or corrective action. Thus, for purposes of providing a status report to the legislature, the pending accepted-claims were necessarily required to be reviewed in order to report them (1) in an appropriate category, *e.g.*, "hearings pendings," "settlement negotiations," "on remand to hearings officer," etc. or (2) formally submit them with the appropriate recommendations. Thus, for all intents and purposes, the pending accepted-claims were the subject of an on-going review process. At the very least, we believe the accepted-claims were "reviewed" each time the Panel prepared and submitted a report to the legislature. However, inasmuch as HRS § 674–17(b) requires claimants to submit "a written notice with the [P]anel that the claimant *does not accept the action taken by the legislature in regular session upon the claim* " (emphasis added), we now turn to examine whether the legislature "acted" upon each claim reported by the Panel in its Final Report, thereby triggering the plaintiffs' right to sue.

### b. *"action" by the legislature*

The State defendants argue that "legislative action" was a condition precedent that was not satisfied in time for the plaintiffs to bring suit in circuit court. The State contends that the requirement of filing written notice with the Panel that a claimant rejects the legislature's "action" upon his or her claim implied that legislative "action" was required. The State defendants further argue that such "action" did not occur as a result of the legislature's decision to defer action and that the plain language of HRS § 674–17 and the legislative history of the statute supports such an interpretation. Specifically, the State defendants note that,

> [f]rom the beginning, the Legislature appreciated the adverse affect waiver of the State's sovereign immunity could have on the State's fiscal condition. It was clearly unwilling to allow individuals to sue for retrospective relief without a study [(*i.e.,* panel review)], and *postponed waiving the*

> *State's sovereign immunity to allow individuals to sue for damages retroactively, until the Governor examined the ramifications and proposed a plan* [(referring to Act 395's provision allowing the governor the opportunity to present a proposal for resolution of individual claims to accommodate the attorney general's concern about the impact of such claims on the State treasury)].

(Citation omitted.) (Emphasis added.) The State defendants assert that the legislature's "deferral" of "action" upon the claims until all claims had been reviewed supports their interpretation of the statute.[23]

The plaintiffs counter that

> [n]owhere in Chapter 674 is there a requirement that the [l]egislature enact legislation on the claims filed with the Panel; the only precondition is notice to the Panel of not accepting the action taken by the legislature in regular session upon the claim. Plainly, if the [l]egislature fails to fund the claims, ignores them or otherwise refuses to consider the claims or offer a remedy, the [l]egislature has acted upon the claims within the language and purpose of the statute.

(Citation, internal quotation marks, footnote, and some brackets omitted.) The plaintiffs further argue that, "for the [l]egislature to waive immunity but stifle any relief through its refusal to review claims and make awards would reduce the statute to an absurdity."

HRS chapter 674 does not provide a definition for "action [of] the legislature in regular session upon the claim" under section 674–17. Nor does any section of the statute set forth or describe the types of "action" the legislature might take, except for HRS § 674–1, which provides that the Panel may "[d]isburse any *compensation awarded* by the legislature in regular session *or undertake other actions as provided by law which are acceptable to a claimant.*" (Emphases added.) In addition, the chapter does not provide an inclusive time period for any type of "action," other than the ultimate deadline of Decem-

---

**23.** As stated in the Background section, the Legislature passed H.B. 1675, extending the notice, filing, and panel report deadlines by one year.

However, the bill was vetoed by then-Governor Cayetano.

ber 31, 1999, when a claimant must bring suit or be forever barred.

In this case, the legislature was presented with the Panel's recommendations on three separate occasions: in 1994 (Act 129's dismissal of two claims), 1997 (the 1997 Panel Report), and 1999 (the 1999 Panel Report). In its Final Report, issued in late–1999, the Panel indicated that, on June 22, 1999, it met to determine the proper course of action following then-Governor Cayetano's veto of H.B. 1675 (that would have extended the notice, filing, and panel report deadlines for an additional year) and decided to inform all claimants of the October 1, 1999 deadline for filing the written notice of rejection to the Panel. Subsequent to the veto of H.B. 1675 on June 10, 1999, the legislature did not override the veto nor amend, repeal, or clarify HRS chapter 674. Without the one-year extension specified in H.B. 1675, the legislature's "deferral" of its consideration of the Panel's recommendations after expiration of the statutory deadlines is subject to two differing interpretations, i.e., that the "deferral" was effectively: (1) a denial of all claims, and, therefore, an "action" upon each claim; or (2) a repeal or expiration of the waiver of sovereign immunity under HRS chapter 674. See also discussion, infra, re: State's alternative contention that HRS § 647–17 constitutes a "statute of repose." The legislative history and the construction of HRS chapter 674 supports the interpretation that the former— rather than the latter—was intended by the legislature.

Throughout the legislative process, the Senate advocated for a direct right to sue in court. The House's insistence on caution resulted in a compromise that added an administrative step to the process. However, the ultimate decision rested with the claimants as to whether the resolution of their claim by the administrative process was acceptable. If not, any dissatisfied-claimant would be entitled to sue in court. No limit on the total amount of damages was ever included in the statute. Therefore, the legislature's control over the cost to the State was limited to its power to offer an *acceptable* remedy to the claimants. If this court were to conclude that the legislature was required

to do some affirmative "act," then the legislature's "deferral" of its actions until the applicable deadlines had passed would nullify Part III of the statute, leaving the plaintiffs with no remedy whatsoever, which is absurd, given the purpose of the statute and the legislature's efforts to effectuate such purpose. Had the legislature intended that it have absolute control over the claimants' right-to-sue in court in order to avoid an unexpected impact on the State treasury, it would have expressly set forth limitations and not left the choice to accept legislative relief in the hands of the claimants. *See Ass'n of Apartment Owners of Maalaea Kai, Inc. v. Stillson,* 108 Hawai'i 2, 28, 116 P.3d 644, 670 (2005) (applying the rule that, "because the legislature is presumed not to intend an absurd result, legislation should be construed to avoid, if possible, inconsistency, contradiction, and illogicality" (citation omitted)).

Moreover, the State defendants' argument that the waiver of sovereign immunity was "postponed" because the legislature required the governor to "examine the effect of the claim" and provide a study prior to allowing the claimants to sue in court lacks merit. Section 5 of Act 395 specifically provided a right to sue for actual damages if (1) the governor failed to submit a proposal to resolve the retroactive claims or (2) the legislature rejected the governor's proposal and there was no other avenue for relief. 1988 Haw. Sess. L. Act 395, § 5 at 945. Subsequent legislative history and the structure of HRS chapters 673 and 674 reflect a compromise: the legislature, in response to the House's concerns, had the first opportunity to provide relief; if the legislative "action," including a dismissal of a claim was not acceptable to the beneficiary, then the beneficiary could bring the claim to the circuit court. The stated purpose of Act 14 and its shortening of the statutory deadline to file suit was to:

> Further the public interest by *ensuring that claims* which have arisen or may arise in the future with respect to the administration of the Hawaiian home lands and are brought pursuant to chapters 673 and 674, Hawaii Revised Statutes, *are resolved in a fair, complete, and timely manner.*

1995 Haw. Sp. Sess. L. Act 14, § 2 at 698 (emphases added). Even in 1999, when executive officials suggested that the legislature implement proposals to limit the available relief by excluding waiting list claims, the legislature refused. *See supra* section I.A.8. Thus, the legislature's repeated desire to bring closure to the matter and its attempt to provide its own form of relief as a more flexible alternative to judicial proceedings indicates that the administrative and judicial processes are alternative, but distinct, avenues for relief and that the overall intent is to resolve the claims.

A conclusion that a claim must have been the subject of legislation would render the two claims dismissed by the legislature via Act 129 as the only claims for which the waiver of sovereign immunity applies. In addition, a conclusion that an advisory opinion upon a claim must have been included in a Panel report to be "acted upon" by the legislature would mean that only the Ah Chong Group (who had received advisory opinions on their claims that were presented to the legislature) would be entitled to proceed under Part III (judicial process) of Chapter 674. Such conclusion would exclude the Boner and Kalima Groups (whose claims received an advisory opinion that was not presented to the legislature) through no fault of their own, clearly a result that is at odds with the underlying purpose to provide relief to the individual claimants. Here, the plaintiffs, having received no affirmative legislative action by the notice-filing deadline of October 1, 1999, acted properly to preserve their rights by (1) timely submitting the required written notice rejecting the legislature's action, *i.e.*, deferral that effectively denied all claims, and (2) filing suit before the corresponding deadline. Consequently, the conditions of Panel "review" and legislative "action" as set forth in the definition of "aggrieved individual claimant" under HRS § 674–17 are met.

c. *whether HRS § 674–17 operates as a statute of repose that bars the plaintiffs' claims*

The State argues, in the alternative, that HRS § 674–17 is a "statute of repose" that: (1) limits the availability of actions brought under HRS chapter 674; (2) makes compliance a condition precedent to prosecution of a claim under HRS chapter 674; (3) is substantive and not procedural; and (4) is jurisdictional. The State further argues that:

As a statute of repose, the October 1 deadline [to file a notice of non-acceptance with the Panel] constituted "a condition precedent which establishes a time period in which suit must be brought in order for the cause of action to be recognized. The limitation period does not depend upon an injury or the accrual of a cause of action, but depends on the occurrence of a specific event." *Tipton v.[&] Young Construction Co., Inc. [v. Blue Ridge Structure Co.]*, [116 N.C.App. 115,] 446 S.E.2d 603, 604–05 (N.C.App.1994). After the time period specified in a statute of repose runs, the cause of action of which a statue is an integral part is completely eliminated. *McGuinnes[McGuinness] v. Cotter*, [412 Mass. 617,] 591 N.E.2d 659, 662 (Mass. 1992). *See also, Coslow v. General Electric Co.*, 877 S.W.2d 611, 612 (Ky.1994) ("a statute of repose potentially bars a plaintiff's suit before the cause of action accrues"); *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2nd Cir.1998) ("a statute of repose extinguishes the cause of action, . . . Thus, a statute of repose may bar commencement of an action even before the cause of action accrues.")

Together, *Panel review and action by the Legislature before the October 1, 1999 [deadline] constitute a statute of repose which extinguished [Chapter] 674's waiver of sovereign immunity.* Because the waiver expired before the plaintiffs filed suit, their claims for money damages for breach of trust under [Chapter] 674 [are] barred by sovereign immunity.

(Emphasis added.)

The plaintiffs respond that:

[t]he "logic" of the State's position . . . is not clearly explained or articulated. Instead, the State [defendants] ask[ ] the [c]ourt to leap to an unsupported conclusion and accept that it is the "notice-filing deadline" . . . which constitutes a statute of repose and all claims are thereafter

barred—even though the statute clearly states otherwise, permitting claims to be filed until December 31, 1999.

The plaintiffs state three additional reasons why the State's position is "fatally flawed": First, if there was an expiration of the right to sue, that expiration could only occur on December 31, 1999, *the deadline for filing actions* in circuit court under Chapter 674. Second, and equally important, the State [defendants] failed to appeal the appropriate Findings of Fact and Conclusions that establish that the October 1, 1999 notice deadline was met by all plaintiffs in this case.... Finally, the right to sue and the waiver of immunity are distinct matters; nowhere in the statute is the waiver limited in time.

(Emphasis in original.) The plaintiffs alternatively argue that, "even if the waiver of sovereign immunity expired on December 31, 1999, it did not eliminate the exercise of rights by [the p]laintiffs prior to that date" because the plaintiffs "filed suit on December 29, 1999, two days before any expiration of sovereign immunity waiver."

In light of our holding that the "Panel review and action by the legislature" requirements of HRS § 674–17(b) were satisfied, the State defendants' argument that HRS § 674–17's notice deadline bars the plaintiffs' claims under HRS chapter 674 is unavailing. In other words, even assuming the "review" and "action" requirements of HRS § 674–17 created a statute of repose, those requirements were satisfied such that the State's waiver of sovereign immunity under HRS § 674–16 did not expire before the plaintiffs filed suit in circuit court. Accordingly, the circuit court did not err in ruling that the plaintiffs are entitled to pursue their claims under HRS chapter 674.

C. *Whether the Circuit Court Erred in Granting Partial Summary Judgment on Count I on the Basis That the Plaintiffs are Entitled to Bring Suit for Breach of Settlement Agreement in the Circuit Courts Under HRS § 661–1*

The plaintiffs contend that, "irrespective of their rights under Chapter 674, [their] claims are actionable independently under

HRS chapter 661." The plaintiffs assert that, in passing Act 14, the State assumed a contractual obligation "to provide all Plaintiff-beneficiaries with the full range of remedies contemplated under Chapter 674 for their individual claims." The plaintiffs further argue that:

> Act 14 encompasses two separate but complementary processes for making the trust *and its beneficiaries* whole, *both* of which are essential to the settlement and binding upon the State. These are the so-called "$600 million settlement" whereby the State has committed itself to *make whole the HHCA trust* by paying $30 million per year into the trust for twenty years, Act 14, § 6, and the process established in Chapter 674 to *make whole the individual beneficiaries of the HHCA trust* by compensating them for the injuries they suffered as individuals.

(Emphases in original.) (Footnote omitted.) The plaintiffs conclude that,

> if the State [defendants] persuade[ ] the Court that, by refusing to provide a remedy under Chapter 674, it extinguished the beneficiaries' right to seek compensation under that Chapter, the Court must conclude that, in doing so, the State has run afoul of HRS § 661–1. Otherwise, the State would be permitted to avoid both its trust obligations and the settlement intended to remedy its breach of those same obligations.

Accordingly, the plaintiffs take the position that the circuit court properly concluded that Act 14 is a settlement agreement that guarantees them the right to sue under HRS chapter 674.

The State argues that the circuit court erred in concluding that Act 14 was a settlement agreement and, therefore, a contract, such that HRS § 661–1 provides an alternative to bringing a suit for damages against the State defendants for breach of trust under Chapter 674. Specifically, the State defendants contend that (1) "[t]here is no precedent in Hawai'i which recognizes that a statute may serve as an express or implied 'contract' with the State upon which a claim for money damages may be founded" and (2)

"federal precedent cautions against interpreting the Tucker Act,[24] [HRS § ] 661–1's federal counterpart, as supporting such a ruling." (Footnote omitted.) The State defendants also contend that:

[A]ll references to and exceptions and exclusion for [Chapter] 674 contained in Act 14 were made to literally shelter and preserve [Chapter] 674's process and remedies from being extinguished by Act 14's passage. The legislature knew that only two years before, it had extended [Chapter] 674's effectiveness until 1997. Through annual reports, it knew that only a few claims had been reviewed by the Panel and presented to the Legislature for action.

Most importantly, it knew that [Act 14] was being enacted to complete the third and last leg of the journey that started in 1987 . . . [Chapter] 673 allowed native Hawaiians to sue for damages for breach of trust [for] both the public land and [the Hawaiian home lands] trusts prospectively. [Chapter] 674 was in place to process individual HHCA beneficiaries' . . . claims for breach of the Hawaiian [home lands] trust. With the passage of [Act 14], the [ ] trust itself was finally repaired.

HRS § 661–1 (1993) provides in pertinent part:

**Jurisdiction.** The several circuit courts of the State . . . shall, subject to appeal as provided by law, have original jurisdiction to hear and determine . . . all questions of fact involved without the intervention of a jury.

(1) All claims against the State founded upon any statute of the State; . . . or upon any contract, expressed or implied, with the State, and all claims which may be referred to any such court by the legislature[.]

(Bold emphasis in original.) (Underscored emphases added.) Inasmuch as the above statute is jurisdictional, the issue presented is whether Act 14 constitutes a contract that guarantees the remedies provided under HRS chapter 674.

■ The State correctly points out that there is no precedent in Hawai'i recognizing that a statute may serve as an express or implied contract with the State for purposes of invoking HRS § 661–1's waiver of sovereign immunity. As such, the court looks to federal precedent for guidance. *See Office of Hawaiian Affairs v. State*, 110 Hawai'i 338, 352–53, 133 P.3d 767, 781–82 (2006) [hereinafter, *OHA II* ]. In *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), the United States Supreme Court stated that:

[T]he Tucker Act does not create any substantive right enforceable against the United States for money damages. A substantive right must be found in some other source of law, such as the Constitution, or any Act of Congress, or any regulation of an executive department. Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States, and *the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.*

*Id.* at 216–17, 103 S.Ct. 2961 (citations, footnote, and internal quotation marks omitted) (emphasis added). In determining whether a law could be interpreted as mandating compensation, the Supreme Court set forth the following principles in *National Railroad Passenger Corp. v. Atchison Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985):

For many decades, this Court has maintained that[,] absent some clear indication that the legislature intends to bind itself contractually, **the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the**

---

**24.** The Tucker Act, 28 U.S.C. § 1491 (1996), provides in pertinent part:

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States[.]

(Bold emphasis in original.)

legislature shall ordain otherwise." *Dodge v. Board of Education,* 302 U.S. 74, 79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937). *See also Rector of Christ Church v. County of Philadelphia,* 24 How. [65 U.S.] 300, 302, 16 L.Ed. 602 (1861) ("Such an interpretation is not to be favored"). This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 104–105, 58 S.Ct. 443, 447–448, 82 L.Ed. 685 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, " '[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.' " *Keefe v. Clark,* 322 U.S. 393, 397, 64 S.Ct. 1072, 1074, 88 L.Ed. 1346 (1944) (quoting *Charles River Bridge v. Warren Bridge,* 11 Pet. [36 U.S.] 420, 548, 9 L.Ed. 773 (1837)). Thus, the party asserting the creation of a contract must overcome this well-founded presumption, *Dodge, supra,* 302 U.S. [ ] at 79, 58 S.Ct. [ ] at 100, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

In determining whether a particular statute gives rise to a contractual obligation, "it is of first importance to examine the language of the statute." *Dodge,* [302 U.S.] at 78, 58 S.Ct. [ ] at 100. *See also Indiana ex rel. Anderson v. Brand, supra,* 303 U.S. [ ] at 104, 58 S.Ct. [ ] at 447 ("Where the claim is that the State's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract"). "If it

provides for the execution of a written contract on behalf of the state[,] the case for an obligation binding upon the state is clear." 302 U.S. [ ] at 78, 58 S.Ct. [ ] at 100 (emphasis supplied). But absent "an adequate expression of an actual intent" of the State to bind itself, *Wisconsin & Michigan R. Co. v. Powers,* 191 U.S. 379, 386–387, 24 S.Ct. 107, 108–109, 48 L.Ed. 229 (1903), this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party.

*Id.* at 465–68, 105 S.Ct. 1441 (bold emphasis added) (underscored emphasis in original); *see also United States Trust Co. v. New Jersey,* 431 U.S. 1, 18 n. 14, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."). Thus, we first examine the language of Act 14 to determine whether it gives rise to a contractual obligation on the part of the State to provide the plaintiffs with the relief provided in HRS chapter 674. *See OHA II,* 110 Hawai'i at 352, 133 P.3d at 782.

Section 1 of Act 14 presents the legislature's findings and describes the impetus for the act's passage. Therein, the legislature recounts the history of the Governor's task force and its actions in carrying out the Governor's Action Plan. By 1994, the State had: (1) resolved all disputed set-asides [25] of Hawaiian home lands that were still under its control; (2) paid compensation for the use of Hawaiian home lands from August 21, 1959 through October 28, 1992; and (3) transferred various lands back to the DHHL. However, the legislature found that, in 1994,

the task force continued to verify and value certain of the claims which remained unresolved.... The Hawaiian homes commission's claims to approximately 39,000 acres of such land are disputed due to different interpretations of the HHCA as it

---

25. The term "set-asides," as used in Act 14, apparently refers to the "thousands of acres of Hawaiian home lands that were allegedly used, disposed of, or withdrawn from the trust by territorial or state executive actions in contravention of the HHCA." 1995 Haw. Sp. Sess. L. Act 14, § 1 at 696.

describes the lands to be made available for use under the provisions of HHCA. Due to the difficulty of determining the intent of Congress in 1921, it is untenable to administratively approve or disprove the validity of these claims.

The legislature finds that, due to the difficulty, time, uncertainty, disruption of public purposes, impact on the public land trust and private landowners, and expense of judicial resolution of remaining disputed claims, another approach, which results in the repair of the Hawaiian home lands trust and the final resolution of claims against the State, is necessary and in the best interests of the State and the beneficiaries of the trust.

. . . .

. . . The legislature by this Act hereby takes these measures to bring the desired closure, *to fully effectuate in part the intent* of S.C.R. No. 185, H.D. 1, 1991 and the Governor's Action Plan, and *to fully effectuate the legislature's intent of final disposition of the matters addressed by this Act. The legislature also finds that the disputes surrounding the Hawaiian home lands trust have caused uncertainty in the State with regard to the limited waiver of sovereign immunity contained in Act 395, Session Laws of Hawai'i 1988. With respect to all controversies arising between August 21, 1959 and July 1, 1988, excluding individual claims provided for pursuant to chapter 674,* Hawai'i Revised Statutes, the State hereby affirms that the limited waiver of sovereign immunity permitted by Act 395, Session Laws of Hawai'i 1988, is now withdrawn and, to the extent the waiver was not previously withdrawn, it is now fully withdrawn. *All claims arising between August 21, 1959 and July 1, 1988,* or under any other law enacted in furtherance of the purposes or objectives of Act 395, Session Laws of Hawai'i 1988, *except those permitted by chapter 674, Hawai'i Revised Statutes, are hereby forever barred.*

. . . .

In passing this Act, it is the intent of the legislature *in part to (a) resolve all controversies for the period between August 21,* *1959 and July 1, 1988, allowed by Act 395, Session Laws of Hawai'i 1988, except those permitted by chapter 674, Hawai'i Revised Statutes,* (b) resolve all controversies relating to the validity of the patents issues after 1920 and prior to July 1, 1988, and affecting any lands covered by or allegedly covered by the HHCA and to all rights arising from or relating to such patents as issued, and ʻ(c) *make certain other related amendments to chapters 673 and 674, Hawai'i Revised Statutes.* Additionally, it is the intent of the legislature that[,] if the State is alleged to be liable[ ] for claims of breaches of the Hawaiian home lands trust prior to statehood, this Act shall dispose of and resolve those claims against the State as well.

1995 Haw. Sp. Sess. L. Act 14, § 1 at 697–98 (emphases added).

Section 2 of Act 14 lists the purposes of the act, which were to:

(1) Resolve all controversies relating to the Hawaiian home lands trust which arose between August 21, 1959 and July 1, 1988;

(2) Prohibit any and all future claims against the State resulting out of any controversy relating to the Hawaiian home lands trust which arose between August 21, 1959 and July 1, 1988;

(3) Resolve all controversies after 1920 and prior to July 1, 1988 relating to the validity of patents issued and affecting any lands covered by or allegedly covered by HHCA and to all rights arising from or relating to such patents as issued;

. . . .

(6) *Further the public interest by ensuring that claims which have arisen or may arise in the future with respect to the administration of the Hawaiian home lands and are brought pursuant to chapters 673 and 674, Hawai'i Revised Statutes, are resolved in a fair, complete, and timely manner.*

1995 Haw. Sp. Sess. L. Act 14, § 2 at 698 (emphasis added). The Act clearly describes the effect of its passage on existing claims, stating:

The passage of this Act is in full satisfaction and resolution of all controversies at law and in equity, known or unknown, now existing or hereafter arising, established or inchoate, arising out of or in any way connected with the management, administration, supervision of the trust, or disposition by the State or any governmental agency of any lands or interest in land which are or were or are alleged to have been Hawaiian home lands, or to have been covered by the HHCA arising between August 21, 1959 and July 1, 1988.

The passage of this Act shall have the effect of *res judicata* as to all parties, claims, and issues which arise and defenses which have been at issue, or which could have been or could in the future be, at issue, which arose between August 21, 1959 and July 1, 1988, whether brought against the State or its officials, directly or indirectly, by subrogation, derivative or third party action, tender, federal action, or by any other means whatsoever.

. . . .

*Nothing in this section shall replace or affect the claims of beneficiaries with regard to* (a) reparations from the federal government, (b) claims arising subsequent to July 1, 1988 and brought pursuant to sections 2, 3, and 4 of Act 395, Session Laws of Hawai'i 1988, except as otherwise provided in section 13 of this Act or (c) *Hawaiian home lands trust individual claims brought pursuant to chapter 674, Hawai'i Revised Statutes, except as otherwise provided in sections 14, 15, and 16 of this Act.*

1995 Haw. Sp. Sess. L. Act 14, § 4 at 699 (emphases added).

Section 6 of Act 14 lists the actions to be taken by the legislature to resolve and satisfy "all controversies and claims encompassed"

by the act, including: (1) the establishment of a trust fund; (2) the transfer of several parcels of land; and (3) the payment of rent and other monies for use of the Hawaiian home lands. 1995 Haw. Sp. Sess. L. Act 14, § 6 at 700. The Act then reiterates its withdrawal of the waiver of sovereign immunity for retroactive trust-related claims, stating:

To the extent still available, the limited waiver of sovereign immunity is hereby withdrawn with respect to any claim, cause of action or right of action against the State arising out of an act or omission committed or omitted between August 21, 1959 and July 1, 1988, excluding individual claims under chapter 674, Hawai'i Revised Statutes as first permitted by Act 395, Session Laws of Hawai'i 1988, or under any other law enacted in furtherance of the purposes of that Act. *Any claim, cause of action or right of action permitted by Act 395, Session Laws of Hawai'i 1988, is forever barred except with regard to:*

(1) A cause of action accruing after June 30, 1988 as may be permitted by chapter 673, Hawai'i Revised Statutes; or

(2) *An individual claim as may be permitted by chapter 674, Hawai'i Revised Statutes.*

1995 Haw. Sp. Sess. L. Act 14, § 12 at 702 (emphases added). The legislature, thus, amended HRS § 674–2's [26] definition of "actual damages" to clarify that the damages were allowed for acts or omissions by an employee of the State "with respect to an individual beneficiary" in the management and disposition of trust resources. 1995 Haw. Sp. Sess. L. Act 14, § 14 at 702 (emphasis omitted).

To further its purpose of ensuring that claims under Chapter 674 would be resolved in a "fair, complete, and timely manner," the legislature amended HRS § 674–19 [27] by ad-

---

**26.** HRS § 674–2 (Supp.1999), as amended, provides that:

"Actual damages" means direct, monetary out-of-pocket loss, excluding noneconomic damages as defined in section 663–8.5 and consequential damages, sustained by the claimant individually rather than the beneficiary class generally, arising out of or resulting from a breach of trust, which occurred between August 21, 1959, and June 30, 1988, and

was caused by an act or omission by an employee of the State *with respect to an individual beneficiary* in the management and disposition of trust resources.
(Emphasis added.)

**27.** HRS § 674–19 (Supp.1996), as amended by Act 14, provided that "[e]very claim cognizable under this part shall forever be barred unless the action is commenced by September 30, 1998."

vancing the time by which a claim must be filed from 1999 to 1998. 1995 Haw. Sp. Sess. L. Act 14, § 15 at 702.

■ Based on the language of Act 14 and the provisions quoted above, we do not believe the legislature intended to enter into a binding contract with respect to the remedies provided under HRS chapter 674. Rather, the act's plain language expresses a clear intent to settle all "title-related" claims and to leave intact the avenue for individual beneficiaries to pursue their claims under Chapter 674, as long as those claims were filed by the advanced-deadline, which was moved up one year by Act 14. Thus, with respect to the individual beneficiary claims under Chapter 674, the language of Act 14 merely indicates the legislature's expressed desire for such claims to be settled in a timely manner. Such expressed *desire* for settlement is not a settlement agreement and cannot be said to give rise to a binding contract to provide the remedies available in HRS chapter 674. Accordingly, we hold that the circuit court erred in granting the plaintiffs the right to sue for breach of contract under HRS chapter 661.

### D. The Plaintiffs' Remaining Claims (Counts III through VII) [28]

The State defendants argue that the circuit court erred in denying their motion for judgment on the pleadings and failing to address their sovereign immunity defense as to all counts. The State defendants essentially contend that the plaintiffs' claims for breach of trust (Counts III and IV) and constitutional violations (Counts V, VI, and VII) are barred by sovereign immunity to the extent that they are claims for money damages. They further contend that the circuit court should have dismissed Counts V, VI, and VII "because [Chapter] 674's remedies expired before [the] plaintiffs sued and no relief can

be fashioned by the courts," and, as such, the claims are non-justiciable. (Capital letters altered.) The plaintiffs counter that the circuit court correctly denied the State defendant's motion because they seek only equitable relief, which, the defendants agree, is not barred by sovereign immunity. Based on a review of the complaint, it appears that the relief sought under the remaining claims is essentially a declaration that the plaintiffs have a right to sue under HRS chapters 674 and 673 and/or 661.

In its August 30, 2000 order, the circuit court denied the State defendant's motion for judgment on the pleadings, treating it as a motion for summary judgment, without providing any explanation. Because the parties' arguments with regard to the remaining counts are relatively undeveloped, we are unable to definitively render a decision with respect to each of the remaining counts or claims represented by such counts. Nevertheless, to the extent that the remaining counts relate to a right to sue under HRS chapter 674, we believe that our holding in section III.B. that Chapter 674's judicial process remains available to the plaintiffs would be applicable. To the extent the remaining counts relate to a right to sue under HRS chapter 661, we believe that our conclusion in section III.C. that Act 14 does not create a contract would be applicable. Finally, we express no opinion with respect to the extent the remaining counts relate to a right to sue under HRS chapter 673 because such claims are not presently before this court.

### IV. CONCLUSION

Based on the foregoing analysis, we affirm in part and vacate in part the December 14, 2001 judgment as follows: (1) affirm the circuit court's determination that the plaintiffs are entitled to pursue their claims under HRS chapter 674; (2) reverse the circuit

---

**28.** As stated previously, the parties agreed to litigate the issue of "jurisdiction" and, consequently, the plaintiffs sought summary judgment only on Count I (right to sue) before proceeding to the remaining issues. The State defendants presented sovereign immunity and justiciability as defenses to all counts as jurisdictional matters in their motion for judgment on the pleadings. The plaintiffs question whether any issues re-

garding the remaining counts are properly before this court inasmuch as they were not resolved by the circuit court. We note that, in denying the Defendant's motion and certifying its order, the circuit court explicitly ruled that the defenses were not available to the State defendants. As such, we briefly address the remaining counts to the extent possible given the limited arguments made by the parties.

court's determination that Act 14 is a settlement agreement and that the plaintiffs have a right to sue under HRS chapter 661; and (3) remand this case to the circuit court for further proceedings consistent with this opinion. With respect to the circuit court's order denying the State defendants' motion for judgment on the pleadings, we neither affirm nor vacate the order because, as discussed in section III.D. above, we are unable to definitively render a decision with respect to the remaining counts or claims represented by such counts.